**REPUBLICAN PARTY OF NORTH CAROLINA; Bruce Briggs; William R. Sigmon; Marvin K. Gray; R. Howard Riddle; Lloyd Fowler; Joe R. Wilson; R. Walter White; Edgar A. Readling, Jr.; Frederic M. Gallagher; Ralph A. Walker, Plaintiffs–Appellants,**

**v.**

**James G. MARTIN, Governor of North Carolina; North Carolina State Board of Elections; Robert N. Hunter, Jr., Chairman of North Carolina State Board of Elections; Thomas A. Farr; William A. Marsh, Jr.; Ruth Turner Semashko; June K. Youngblood; The North Carolina Association of Black Lawyers, Defendants–Appellees,**

**and**

**Durham County Board of Elections; Forsyth County Board of Elections; Guilford County Board of Elections, Defendants.**

No. 91–1741.

United States Court of Appeals, Fourth Circuit.

Argued May 6, 1992.

Decided Nov. 24, 1992.

As Amended Jan. 5, 1993.

944

C. Allen Foster, Patton, Boggs & Blow, Greensboro, N.C., argued (Robert N. Hunter, Jr., Marshall R. Hurley, on brief), for plaintiffs-appellants.

H. Jefferson Powell, Special Counsel to the Atty. Gen., North Carolina Dept. of Justice, Raleigh, N.C., argued (Lacy H. Thornburg, Atty. Gen., Edwin M. Speas, Jr., Sr. Deputy Atty. Gen., Tiare B. Smiley, Special Deputy Atty. Gen., North Carolina Department of Justice, Raleigh, N.C., James E. Ferguson, II, Leslie J. Winner, Ferguson, Stein, Watt, Wallas, Adkins & Gresham, P.A., Charlotte, N.C., Arch T. Allen, II, Moore & Van Allen, Raleigh, N.C., on brief), for defendants-appellees.

Before RUSSELL and WILKINS, Circuit Judges, and WILLIAMS, Senior United States District Judge for the Western District of Virginia, sitting by designation.

## OPINION

WILKINS, Circuit Judge:

The Republican Party of North Carolina (RPNC)[1] appeals an order of the district court dismissing its suit against the North Carolina State Board of Elections (NCSBE)[2] on the ground that RPNC's com-

---

1. Appellants include the Republican Party of North Carolina, individual North Carolina voters registered as Republicans, individual North Carolina voters registered as Democrats but who regularly vote for Republican candidates for superior court judgeships, former candidates for the office of Superior Court Judge in North Carolina, one current Superior Court Judge, and one former Superior Court Judge. For ease of reference, we refer to Appellants collectively as "RPNC."

2. Appellees joining the motion made by the North Carolina State Board of Elections include the Chairman of the North Carolina State Board of Elections, Robert N. Hunter, Jr., and various other individuals *sued as officials responsible for conducting elections in the state.* The North Carolina Association of Black Lawyers, a statewide organization of black lawyers and law

students, successfully moved to intervene as a party defendant, *see Republican Party of N.C. v. Martin,* 865 F.2d 1259 (4th Cir.1988) (per curiam), and joins the motion as well. Defendant James G. Martin, Governor of North Carolina, did not move or join in the motion to dismiss. However, the district court dismissed the complaint against all defendants due to the absence of a justiciable question. *See* Fed.R.Civ.P. 12(h)(3). We refer collectively to Appellees as "NCSBE."

The original defendants also included several county boards of elections. These defendants successfully moved to dismiss early in the litigation. *Republican Party of N.C. v. Martin,* 682 F.Supp. 834 (M.D.N.C.1988) (also granting motion of remaining defendants for change of venue from the Middle District to the Eastern District of North Carolina).

plaint presents a nonjusticiable political question. In its complaint brought under 42 U.S.C.A. §§ 1981, 1983 (West 1981 & Supp.1992), RPNC alleges that the method of electing superior court judges [3] in North Carolina constitutes a political gerrymander intended to deprive members of the Republican Party and others aligned with this political party of rights guaranteed by the First Amendment, U.S. Const. amend. I, and the Equal Protection Clause of the Fourteenth Amendment, *id.* at amend. XIV, § 1. We agree with RPNC that a justiciable question is presented. We further conclude that the complaint states a claim under the Fourteenth Amendment that, if proven, is one upon which relief may be granted. We find, however, that RPNC has failed to state a claim under the First Amendment. Consequently, we reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.

## I.

### A.

Prior to 1868, the General Assembly of North Carolina appointed all state judges. John L. Sanders, *A Brief History of the Constitutions of North Carolina, in The Constitution of the State of North Carolina: Its History and Content* 1, 1–2 (issued by Thad Eure, Secretary of State of North Carolina, 1983). Since 1868, the Constitution of North Carolina has allowed the General Assembly to choose between statewide or districtwide popular elections as the method for selecting superior court judges.[4] *See* N.C. Const. art. IV, § 16 (also noting that current provisions of this section are similar to those of the 1868 constitution as rewritten in 1962). In 1877, the General Assembly implemented the present scheme of statewide elections,[5] *see generally* N.C.Gen.Stat. § 163–1 (Michie 1991) (detailing current timing of primaries and elections), and in 1915, the legislature enacted Chapter 101, a law that includes a requirement that candidates for the office of superior court judge be nominated through party primaries, *see generally id.* § 163–104 (Michie 1991) (current provision addressing primary elections). Although Chapter 101 does not specify that the local primaries be held within each district, the North Carolina State Board of Elections implemented and presently maintains a system of local districtwide primaries.[6] Consequently, voters nominate candidates for superior court judgeships in local party primaries held in each district, and thereafter, the successful primary candidates from each district run against each other in a general, statewide election. Thus, for example, in a given district, the voters select one candidate in the Democratic primary and another in the Republican primary. These candidates then run against each other to fill that superior court judgeship in a general, statewide election in which all of the voters of the state participate.

While superior court judges must "reside in the district for which [they are] elected," N.C. Const. art. IV, § 9(1), the constitution grants the judges statewide jurisdiction, *id.* § 12(3), and permits rotation from district to district within a judicial division,[7] *id.* § 11. Presently, the state is divided into four judicial divisions. *See* N.C.Gen.Stat. § 7A–41 (Michie Supp.1991). According to RPNC's complaint, superior court judges do not actually serve throughout the state because assignment outside of a division

---

**3.** Superior court judges in North Carolina are trial court judges of general jurisdiction.

**4.** The General Assembly must "divide the State into a convenient number of Superior Court judicial districts." N.C. Const. art. IV, § 9(1). The constitution further directs the legislature to organize the counties of the state into judicial divisions to encompass multiple judicial districts. *Id.* §§ 9, 11.

**5.** RPNC maintains that North Carolina is the only state in which trial judges of general juris-

diction are elected by a statewide, general election.

**6.** Neither party points to statutory authority for this practice and our research has uncovered no statute directing it.

**7.** Amendments to the constitution in 1868 resulted in the rotation requirement. *See* N.C. Const. art. IV, § 11 (noting that provisions of § 11 are similar to those of art. IV, § 9 of the constitution of 1868 as rewritten in 1962).

rarely occurs, and a superior court judge exercises unique statutory powers within his or her own district. For example, the judge in each district appoints the local public defender, *id.* § 7A–466(d) (Michie Supp.1991), and fills vacancies for the position of clerk of superior court, *id.* § 7A–100(a) (Michie 1991).

In the mid–1980's, the North Carolina Association of Black Lawyers and others brought suit against Governor Martin alleging that features of the system of electing superior court judges had the purpose and effect of abridging nonwhite voting strength in violation of the Voting Rights Act, 42 U.S.C.A. §§ 1971–74e (West 1981 & Supp.1992), and the Fourteenth Amendment of the United States Constitution. This litigation ended by a consent decree upon adoption by the General Assembly of Chapter 509 of the North Carolina Session Laws of 1987, 1987 N.C.Sess.Laws 509 (codified at scattered sections in N.C.Gen.Stat. §§ 7A–1, *et seq.*, 163–1, *et seq.* (Michie 1991 & Supp.1991)) (Chapter 509). *See Alexander v. Martin,* No. 86–1048–CIV–5 (E.D.N.C. Nov. 25, 1987).

Chapter 509 eliminated staggered terms within multimember judicial districts and mandated redrawing of district lines.[8] *See State ex rel. Martin v. Preston,* 325 N.C. 438, 385 S.E.2d 473, 476–77 (1989); N.C.Gen.Stat. § 7A–41 (setting forth superior court divisions and districts). As a result, the number of judicial districts increased· from 34 to approximately 70.[9] *See Preston,* 385 S.E.2d at 476; N.C.Gen.Stat.

§ 7A–41 (establishing new district lines). Unlike past configurations, the new district lines often split counties and some districts now consist of parts of more than one county. *See Preston,* 385 S.E.2d at 476; N.C.Gen.Stat. § 7A–41 (explaining new district boundaries). RPNC alleges that 16 districts do not have a courthouse, a clerk of court, or any other official associated with the judicial district except for the local superior court judge. In addition, Chapter 509 set forth the requirement that all individuals seeking nomination for the position of superior court judge must, at the time of filing a notice of candidacy, reside within the district for which they seek election as it will exist at the time the individual would take office. *See Preston,* 385 S.E.2d at 477; N.C.Gen.Stat. § 163–106(i) (Michie 1991) (setting forth residency requirement).

According to the allegations of RPNC's complaint, in passing Chapter 509, the General Assembly rejected amendments to eliminate the practice of nomination by primary within each district followed by a statewide general election in favor of a system by which both the primary and general elections ·would be held within each district. RPNC·contends that this defeat marked at least the eighth attempt since 1961 to change the election method.

RPNC maintains that since 1900, in the hundreds of elections for superior court judgeships held in the state, only one Republican has been elected to a superior court judgeship.[10] (This position was elimi-

---

**8.** Subsequent to passage of Chapter 509, Governor Martin filed suit in his individual and official capacity against the State Board of Elections and numerous superior court judges claiming that the statute violated the Constitution of North Carolina because it infringed upon the right of voters to elect judges and the right of candidates to seek judicial office. *See Preston,* 385 S.E.2d at 481–82. Governor Martin further maintained that the legislation usurped his executive authority to appoint judges and that the precandidacy residency requirement unconstitutionally denied otherwise qualified candidates the right to seek office. *See id.* at 482, 486. He did not challenge the practice of districtwide nomination followed by statewide election. The Supreme Court of North Carolina rejected Governor Martin's contentions and held that Chapter 509 comported with the state's con-

stitution. *See id.* at 486. The court also noted that the legislature implemented the statute in order .to bring the state into compliance with the Voting Rights Act and to improve the administration of justice. *See id.* at 479.

**9.** RPNC contends that Chapter 509 resulted in an increase of the number of judicial districts to 70; NCSBE maintains that it increased the number to 73. This difference has no bearing on the holdings we reach, and for simplicity, we consider the state to include 70 judicial districts.

**10.** In its complaint, RPNC alleged that no Republicans had been elected to a superior court judgeship since 1900. However, the parties agree that since the filing of the complaint in 1987, one Republican has been elected to the office.

nated several years later during redistricting.) RPNC further asserts that since 1968, four of the ten Republican candidates for superior court judgeships would have been successful if the general election had been conducted on a districtwide, rather than on a statewide, basis.

RPNC further claims that in the 1984 statewide general election, Republican candidates for superior court judgeships received approximately 46 percent of the overall vote, and Democratic candidates received approximately 54 percent of the overall vote. RPNC's complaint avers that:

> In the 24th Judicial District however, 54% of the voters who voted for Superior Court judges voted for the Republican candidate for Superior Court judge for that district and 46% voted for the Democratic candidate. Similarly, in what were then the 15A, 17B, 18, 19A, 19B, 21, 22, 23, 24, 25, 26, 27A, 28 and 29 Judicial Districts, a majority of voters who voted for Superior Court judge voted for the Republican candidates. No Republican resident Superior Court judges were elected because of the structural dilution of Republican votes by the voting customs, practices, and procedures complained of herein.

In addition, RPNC maintains that in the 1986 election, a similar disparity between the statewide election results and projected district-wide election results occurred in ten judicial districts.[11]

**B.**

RPNC challenges the custom or practice in North Carolina of selecting superior court judges by statewide popular election following local district-wide nomination. According to RPNC, this method of nomination and election contravenes the Fourteenth Amendment by diluting the votes of those who vote for Republican candidates and violates the First Amendment by restricting the rights of Republican voters to free speech and political association. The complaint also contests the validity of the requirement set forth in Chapter 509 that all individuals seeking nomination for the position of superior court judge must, at the time of filing a notice of candidacy, reside within the district for which they seek election. RPNC claims that this provision has the purpose and effect of degrading the influence of Republican voters in violation of the Fourteenth Amendment. RPNC seeks a declaration that the system used to elect superior court judges in North Carolina violates the First and Fourteenth Amendments, an injunction that prohibits NCSBE from conducting elections under the existing scheme, and an order that directs NCSBE to conduct the primary and general elections for superior court judges on a districtwide basis.

NCSBE moved to dismiss the complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[12] The district court granted the motion, holding that RPNC's complaint raised a nonjusticiable political question.[13] RPNC appeals from this adverse ruling.

11. RPNC alleges that statewide voting statistics demonstrate that in the 1986 general election, approximately 43 percent of the electorate that voted for superior court judges voted for Republican candidates and 57 percent voted for Democratic candidates. In the Twenty–Sixth Judicial District, however, 52 percent of the district voters who voted for superior court judges voted for the Republican candidates, while 48 percent voted for the Democratic candidates. According to RPNC, a majority of voters in nine other districts voted for the Republican candidates for superior court judgeships. RPNC maintains that had a Republican candidate offered to run in these districts, and had the election been determined on a district-wide basis, Republican candidates would have prevailed in these districts. Party affiliation for 1986 remained constant from 1984: 27 percent of the voters were registered as Republicans, 69 percent as Democrats, and 4 percent were unaffiliated.

12. In addition, NCSBE maintained that the doctrine of legislative immunity barred the suit. The district court did not consider this defense, and NCSBE did not raise it in this appeal. Consequently, the applicability of this doctrine is not before us.

13. Although the district court purported to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), the court apparently relied primarily on the lack of a justiciable question to reach its holding. Consequently, we view Rules 12(b)(1) and 12(h) as additional authority on which the district court relied for its dismissal.

## II.

■ Justiciability concerns "the power of the federal courts to entertain disputes, and ... the wisdom of their doing so." *Renne v. Geary*, —— U.S. ——, ——, 111 S.Ct. 2331, 2336, 115 L.Ed.2d 288 (1991). Accordingly, we begin our analysis by addressing whether RPNC presents a nonjusticiable political question in complaining that a political gerrymander of the method for electing superior court judges in North Carolina contravenes the First and Fourteenth Amendments.[14] In concluding that claims of vote debasement in the legislative districting context are justiciable, the Supreme Court set forth the framework for analysis of the political question doctrine in *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), articulating six factors that may appear in a case raising a political question:

> Prominent on the surface of any case held to involve a political question is found a [1] textually demonstrable constitutional commitment of the issue to a coordinate political department; [2] or a lack of judicially discoverable and manageable standards for resolving it; [3] or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; [4] or the impossibility of a court's undertaking

independent resolution without expressing lack of the respect due coordinate branches of government; [5] or an unusual need for unquestioning adherence to a political decision already made; [6] or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. at 710. Discovery that any one of these factors is inextricable from a controversy denotes the presence of a political question and renders it nonjusticiable. *Id.*

■ In *Davis v. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986), the Supreme Court examined a claim that a state legislative apportionment scheme diluted the votes of Democrats in violation of the Equal Protection Clause of the Fourteenth Amendment. Confronted with the question of the power of the courts to entertain a claim of political gerrymandering, the Court relied on decisions in which it adjudicated claims of racial gerrymandering to conclude that a complaint of vote dilution "by a political group, rather than a racial group, does not distinguish it in terms of justiciability." *Id.* at 125, 106 S.Ct. at 2806. Thus, the Court held that claims of political gerrymandering are justiciable.[15] *Id.* at 143, 106 S.Ct. at 2816.

---

**14.** We review de novo the decision of the district court to grant a dismissal for lack of a justiciable question. *See Ward v. City of Portland*, 857 F.2d 1373, 1374 (9th Cir.1988).

**15.** We are cognizant of the heated debate surrounding the wisdom and reasoning of the *Bandemer* decision. *See generally Bandemer*, 478 U.S. at 144–61, 106 S.Ct. at 2816–25 (O'Connor, J., concurring in judgment) (arguing that practical concerns should render partisan gerrymandering claims nonjusticiable); *Political Gerrymandering and the Courts* (Bernard Grofman ed., 1990) [hereinafter *Political Gerrymandering*] (collecting articles expressing diverse views on *Bandemer*); Dean Alfange, Jr., *Gerrymandering and the Constitution: Into the Thorns of the Thicket At Last*, 7 Sup.Ct.Rev. 175, 192 (1986) (*Bandemer* explicitly accepts the implicit holding of *Baker* that claims of political gerrymandering are justiciable.); Charles Backstrom et al., *Partisan Gerrymandering in the Post–Bandemer Era*, 4 Const. Commentary 285, 291 (1987) (arguing that *Bandemer* "establishes an important constitutional right"); Peter H. Schuck, *The Thickest Thicket: Partisan Gerry-*

*mandering and Judicial Regulation of Politics*, 87 Colum.L.Rev. 1325, 1330 (1987) (insisting that "[j]udicial regulation of partisan gerrymandering would be a cure worse than the disease"); Edward Still, *The Hunting of the Gerrymander*, 38 UCLA L.Rev. 1019, 1020 (1991) (reviewing *Political Gerrymandering* and arguing that *Bandemer* has "confounded legislators, practitioners, and academics alike" and that while "[s]ome find the case internally incoherent; others find a method to the madness"). Nonetheless, we remain bound by the decision and apply it here. We are also aware of the argument advanced by NCSBE at oral argument that had *Bandemer* come before the Supreme Court in its present composition, a contrary decision may have resulted. Perhaps, but nevertheless we are constrained to apply the edicts of the Court that we understand now exist. *See United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801). The issue of justiciability of claims of political gerrymandering has been decided, and the Court has recognized that equal protection claims properly may be advanced by political groups.

Like *Bandemer*, this controversy questions whether an electoral scheme implemented by a state legislature violates, by diluting votes, the right of a political party to equal protection. Consequently, *Bandemer* controls, in large part, our application of *Baker*. As in *Bandemer*, the issue presented by RPNC is the consistency of state action with the federal constitution, and thus involves no question decided, or to be decided by a branch of government coequal with the federal courts. *See id.* at 123, 106 S.Ct. at 2805–06. This controversy does not present an issue that if addressed by the courts, would cause a foreign or domestic disturbance, would express a lack of respect due to a coordinate branch of government, or would present the potential for embarrassment from multifarious pronouncements by various departments. *See id.* at 122–23, 106 S.Ct. at 2805–06. Further, the issues presented do not raise an unusual need for unquestioning adherence to a political decision already made. *See id.*

NCSBE argues that this case is distinguishable from *Bandemer* and constitutes a nonjusticiable political question because judicially discoverable and manageable standards do not exist to resolve an alleged equal protection violation in the method of electing judges, as opposed to electing legislators. NCSBE correctly points out that in determining that judicially manageable standards existed for resolution of the equal protection issues raised in *Bandemer*, the Court relied on its previous decisions addressing claims of vote dilution and violations of the one-person, one-vote rule brought by racial groups. *See id.* at 123–25, 106 S.Ct. at 2805–06; *see also White v. Regester*, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973). The Court concluded that because those decisions and *Bandemer* involved similar questions of fair representation, judicially discoverable and manageable standards existed for resolution of these issues. *See Bandemer*, 478 U.S. at 124, 106 S.Ct. at 2806. From these conclusions in *Bandemer*, NCSBE reasons that because superior court judges are not representative governmental officials, the issues presented here do not raise questions of fair representation on the part of the elected officials, and thus that the allegations brought by RPNC necessarily involve a nonjusticiable political question. We disagree.

RPNC alleges a claim of vote dilution under the Fourteenth Amendment much like that presented in *Bandemer*. *Baker* directs us to determine the existence of judicially discoverable and manageable standards, *Baker*, 369 U.S. at 217, 82 S.Ct. at 710, and, as *Bandemer* emphasizes, " '[j]udicial standards under the Equal Protection Clause are well developed and familiar,' " *Bandemer*, 478 U.S. at 122, 106 S.Ct. at 2805 (quoting *Baker*, 369 U.S. at 226, 82 S.Ct. at 714–15). The standards for adjudicating constitutional challenges to election schemes for legislators apply equally to challenges to election schemes for superior court judges. Both claims require a court to determine whether a state has unconstitutionally diluted voting strength by implementing and maintaining a defective election scheme. *Cf. id.* at 123–25, 106 S.Ct. at 2805–06; Bernard Grofman, *Toward a Coherent Theory of Gerrymandering: Bandemer and Thornburg* [hereinafter *Toward a Coherent Theory* ], *in Political Gerrymandering* 29, 53–56 (Bernard Grofman ed., 1990) (predicting that the Court will merge racial and political gerrymandering to allow type of proof used in the former to be used in the latter). Consequently, we conclude that the standards governing other types of vote dilution claims provide judicially discernable and manageable standards for resolution of this case. We decline to hold that standards are discoverable only when the election of legislators is involved.

NCSBE further argues that by adjudicating RPNC's claims, we shall be called upon to make an initial policy determination of a kind clearly for nonjudicial discretion because elected superior court judges are not representative governmental officials. NCSBE, however, fails to identify why the distinction between legislators and popularly-elected judges requires an initial policy determination that lies beyond our competence, nor do we perceive a reason why the

distinction requires such a determination. We consider differences between the type of elected officials as pertinent to an adjudication of the merits of the claim, rather than to the justiciability of the case. *Cf. Bandemer,* 478 U.S. at 125, 106 S.Ct. at 2806 (characteristics of complaining group are relevant to merits of case, not to justiciability); *United States Dep't of Commerce v. Montana,* —— U.S. ——, ——, 112 S.Ct. 1415, 1425, 118 L.Ed.2d 87 (1992) (noting that justiciability focuses on the power of the court to entertain an issue, not on the merits of the case). We conclude, therefore, that RPNC's claims are justiciable.

### III.

■ Because we may affirm a judgment for any reason appearing on the record, *see McMahan v. International Ass'n of Bridge, Structural & Ornamental Iron Workers, Local 601,* 964 F.2d 1462, 1467 (4th Cir.1992), we next consider whether RPNC's complaint states a claim upon which relief may be granted, *see* Fed. R.Civ.P. 12(b)(6).[16] A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint; importantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. *See* 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1356 (1990). Our inquiry then is limited to whether the allegations constitute " 'a short and plain statement of the claim showing that the pleader is entitled to relief.' " *Bolding v. Holshouser,* 575 F.2d 461, 464 (4th Cir.) (quoting Fed. R.Civ.P. 8(a)(2)), *cert. denied,* 439 U.S. 837, 99 S.Ct. 121, 58 L.Ed.2d 133 (1978). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). We must assume that the allegations of the complaint are true and construe them in the light most favorable to the plaintiff. *See Jenkins v. McKeithen,* 395 U.S. 411, 421, 89 S.Ct. 1843, 1848, 23 L.Ed.2d 404 (1969). Finally, to state a claim of vote dilution brought about by political gerrymandering under these standards, the Supreme Court requires an elevated threshold showing of an actual discriminatory effect. *See Bandemer,* 478 U.S. at 134 & n. 14, 106 S.Ct. at 2811 & n. 14.

### IV.

#### A.

■ In a broad sense, "[t]he Equal Protection Clause requires every State to govern impartially." *Karcher v. Daggett,* 462 U.S. 725, 748, 103 S.Ct. 2653, 2668, 77 L.Ed.2d 133 (1983) (Stevens, J., concurring). The Clause "does not take from the States all power of classification." *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 271, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). Instead, "[i]t simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike." *Nordlinger v. Hahn,* —— U.S. ——, ——, 112 S.Ct. 2326, 2331, 120 L.Ed.2d 1 (1992). Consequently, to comport with the Equal Protection Clause, classifications must relate to a proper governmental purpose and may not rest upon impermissible criteria. *Cf. id.* (noting that different treatment of newer and older homeowners under state acquisition-value assessment scheme for property taxes does not qualify for heightened review and must only rationally relate to a legitimate state interest); *Feeney,* 442 U.S. at 272, 99 S.Ct. at 2292 (noting that classifications based on race are presumptively invalid). In the context of voting rights, the Clause guarantees the electorate equality of participation in the political process by prohibiting barriers to exercise of the franchise and restrictions on access to the ballot and by ensuring the equality of votes through the forbiddance of vote dilution and unequal weighing of votes. *See* J. Harvie Wilkinson III, *The Supreme Court, the*

---

**16.** We review a dismissal under Rule 12(b)(6) de novo. *Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989).

*Equal Protection Clause, and the Three Faces of Constitutional Equality*, 61 Va. L.Rev. 945, 958–59 (1975).

■ NCSBE contends that because the goal of equal protection in the context of voting rights is fair and effective representation for all citizens, *see Reynolds v. Sims*, 377 U.S. 533, 565–66, 84 S.Ct. 1362, 1383–84, 12 L.Ed.2d 506 (1964), the protection afforded by the Equal Protection Clause does not encompass claims of constitutional infirmities surrounding the election of judges since they are not representative governmental officials. NCSBE argues that judges do not act in a politically responsive manner or make decisions in accordance with the views of a constituency. Consequently, this argument concludes, judges cannot be considered representative governmental officials for purposes of an equal protection claim. This interpretation of the Clause, however, misconstrues the interplay between the fundamental protection of the Clause that prohibits classifications not related to a suitable governmental purpose, the goal the state seeks to advance, and the justifications offered by a state for its election scheme. To allege a prima facie equal protection violation, it is enough that a plaintiff complains of governmental treatment dissimilar to that received by others similarly situated. *Cf. Bandemer*, 478 U.S. at 127–34, 106 S.Ct. at 2807–11 (A prima facie case of political gerrymandering requires allegations of intentional discrimination, disproportionate results, and exclusion from the political process as a whole.). In order to rebut a prima facie case, a state must demonstrate adequate justifications that relate to the goal of the classification. *Cf. Reynolds*, 377 U.S. at 565, 84 S.Ct. at 1383 (noting that criteria for differentiation in weighing of votes are insufficient to justify discrimination "unless relevant to the permissible purposes of legislative apportionment"). As a result, questions pertaining to the goals and justifications offered by NCSBE for its scheme of electing superior court judges are not presently before us because they are not relevant to whether RPNC has stated a claim upon which relief may be granted.

■ Even if we agreed with NCSBE that the position occupied by an elected official bears on the protection afforded by the Equal Protection Clause, we nevertheless would be compelled to conclude that the election of superior court judges in North Carolina implicates the goal of equal protection and issues of fair and effective representation. In *Chisom v. Roemer*, —— U.S. ——, ——, 111 S.Ct. 2354, 2367, 115 L.Ed.2d 348 (1991),[17] the Supreme Court responded to the argument that elected judges are immune from public opinion because they are frequently called upon to ignore or defy popular sentiment, explaining that the state "decided to elect its judges and to compel judicial candidates to vie for popular support just as other political candidates do," and thus opted to remove judges from the shelter provided by appointment. The Court concluded:

> If executive officers, such as prosecutors, sheriffs, state attorneys general, and state treasurers, can be considered "representatives" simply because they are chosen by popular election, then the

---

**17.** In *Chisom,* the Supreme Court held that the term "representatives" describes the winners of representative, popular elections and that state supreme court judges are representatives for purposes of a claim of vote dilution under § 2 of the Voting Rights Act, 42 U.S.C.A. § 1973 (West Supp.1992). *Chisom,* —— U.S. at ——, 111 S.Ct. at 2368; *see also Houston Lawyers' Ass'n v. Attorney Gen. of Texas,* —— U.S. ——, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991) (Section 2 is applicable to vote dilution claims regarding election of trial judges.); *cf. Haith v. Martin,* 618 F.Supp. 410 (E.D.N.C.1985) (Preclearance requirements of § 5 of the Act apply to elections of judges.), *aff'd mem.,* 477 U.S. 901, 106 S.Ct. 3268, 91 L.Ed.2d 559 (1986). The Act forbids imposition of a voting qualification on account of race or color that results in denial or abridgement of the right to vote. *Chisom,* —— U.S. at ——, 111 S.Ct. at 2362. We recognize that the issue presented in *Chisom* was one of statutory interpretation; yet, in addition to reliance on its interpretation of the Act, the Court engaged in a common-sense analysis of how elected judges fit into the scheme of electoral politics. *See id.* at ——, 111 S.Ct. at 2366–67; *see also* Victor J. Franckiewicz, Jr., Case Note, 38 Loy.L.Rev. 211, 222 (1992). Thus, we conclude that the analysis in *Chisom* applies to claims pursued under the Equal Protection Clause.

same reasoning should apply to elected judges....

. . . .

The fundamental tension between the ideal character of the judicial office and the real world of electoral politics cannot be resolved by crediting judges with total indifference to the popular will while simultaneously requiring them to run for elected office.... [I]t seems both reasonable and realistic to characterize the winners as representatives....

*Id.* at ———— ————, 111 S.Ct. at 2366–67 (footnotes omitted). Even if judges are not representatives in the sense that they represent the interests of their constituents, the electorate undoubtedly considers the broad philosophical views of candidates when voting.[18]

NCSBE maintains that *Wells v. Edwards,* 347 F.Supp. 453 (M.D.La.1972),

*aff'd mem.,* 409 U.S. 1095, 93 S.Ct. 904, 34 L.Ed.2d 679 (1973), requires a contrary result. In *Wells,* the district court rejected a claim based on the one-person, one-vote doctrine applied to the election of Louisiana Supreme Court justices, reasoning that " '[j]udges do not represent people, they serve people.' "[19] *Id.* at 455 (quoting *Buchanan v. Rhodes,* 249 F.Supp. 860, 865 (N.D.Ohio 1960), *appeal dismissed,* 385 U.S. 3, 87 S.Ct. 33, 17 L.Ed.2d 3 (1966)). Vote dilution and one-person, one-vote claims are distinct, and therefore *Wells* does not mandate a dismissal of a claim based on vote dilution.[20] *See Voter Info. Project, Inc. v. City of Baton Rouge,* 612 F.2d 208,. 210–12 (5th Cir.1980) (recognizing distinction between claims grounded in one-person, one-vote and vote dilution in Rule 12(b)(6) challenge to an at-large method of electing state and city judges).[21]

18. Beyond this, there also lies the very real possibility that party affiliation may reflect judicial philosophy and ultimately the outcome of judicial decisions. *See, e.g.,* Stuart S. Nagel, *Political Party Affiliation and Judges' Decisions,* 55 Am.Pol.Sci.Rev. 843, 847–49 (1961) (suggesting that study results show that "in some cases, judges rely on their personal standards of value in reaching a decision," that "these same personal standards also frequently account for their party affiliation," and that appointed judges may be more likely to vote contrary to their party pattern); Burt Neuborne, *The Myth of Parity,* 90 Harv.L.Rev. 1105, 1128 (1977) (opining that elections render state judges "vulnerable to majoritarian pressure when deciding constitutional cases") (footnote omitted); Andrew S. Marovitz, Note, *Casting a Meaningful Ballot: Applying One–Person, One–Vote to Judicial Elections Involving Racial Discrimination,* 98 Yale L.J. 1193, 1206–07 (1989) (arguing that "the amount of pressure felt by a state court judge in rendering a decision will be influenced directly by the method of judicial election utilized" and that "[j]udges elected by partisan election are most susceptible to direct pressure") (footnotes omitted).

19. We are well aware of the numerous decisions like *Wells,* holding that a judicial office is not a representative one in the context of voting rights challenges. *See, e.g., Holshouser v. Scott,* 335 F.Supp. 928, 932 (M.D.N.C.1971) (holding that one-person, one-vote "rule does not apply to the state judiciary"), *aff'd mem.,* 409 U.S. 807, 93 S.Ct. 43, 34 L.Ed.2d 68 (1972); *League of United Latin Am. Citizens Council No. 4434 v. Clements,* 914 F.2d 620, 626 n. 9 (5th Cir.1990) (citing cases rejecting challenges to judicial elections on various grounds), *rev'd sub nom. Houston*

*Lawyers' Ass'n v. Attorney Gen. of Texas,* —— U.S. ——, 111 S.Ct. 2376, 115 L.Ed.2d 379 (1991); Edward A. Sheridan, Note, *The Equal–Population Principle: Does It Apply to Elected Judges?,* 47 Notre Dame Law. 316, 320–326 (1971) (discussing cases rejecting application of vote debasement principles to judicial elections); Marovitz, *supra* note 18, at 1199 & n. 56 (same).

20. The Supreme Court summarily affirmed the opinion of the district court in *Wells,* and we are, of course, bound by it. The precedential effect of *Wells,* however, "extends no further than the precise issues presented and necessarily decided by those actions." *Anderson v. Celebrezze,* 460 U.S. 780, 784 n. 5, 103 S.Ct. 1564, 1568 n. 5, 75 L.Ed.2d 547 (1983) (citing *Mandel v. Bradley,* 432 U.S. 173, 176, 97 S.Ct. 2238, 2240, 53 L.Ed.2d 199 (1977)). Further, the Court may " 'find it appropriate to give full consideration to a question that has been the subject of previous summary action.' " *Bandemer,* 478 U.S. at 121, 106 S.Ct. at 2804 (quoting *Washington v. Yakima Indian Nation,* 439 U.S. 463, 477 n. 20, 99 S.Ct. 740, 749, n. 20, 58 L.Ed.2d 740 (1979)). We believe that the questions of whether superior court judges are governmental representatives, and whether differences among elected officials bear on establishing a prima facie case of discrimination, relate to the justification offered by NCSBE for the classification rather than to whether RPNC has presented a prima facie case of discrimination.

21. The treatment of *Wells* by the Supreme Court in *Chisom* does not compel a different result. *See Chisom,* —— U.S. at ——, 111 S.Ct. at 2367–68. There, the state maintained that without

### B.

Having rejected NCSBE's contention that the Equal Protection Clause is not implicated, we now address whether RPNC's complaint sets forth a prima facie case of vote dilution brought about by political gerrymandering.[22] In order to state such a claim, a plaintiff must allege "intentional discrimination against an identifiable political group and an actual discriminatory effect on that group." *Bandemer*, 478 U.S. at 127, 106 S.Ct. at 2808. The effect portion of the test "requires a showing of more than a *de minimis* effect." *Id.* at 134, 106 S.Ct. at 2811. Consequently, a plaintiff must complain that an actual or projected history of disproportionate results exists, *id.* at 139, 106 S.Ct. at 2813–14, and that "the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole," *id.* at 132, 106 S.Ct. at 2810. The intent standard set forth in the *Bandemer* plurality opinion is easily met, and we conclude that RPNC's complaint offers sufficient allegations of intent to withstand dismissal under Rule 12(b)(6). *See id.* at 127–29 & n. 11, 106 S.Ct. at 2807–09 & n. 11; Backstrom et al., *supra* note 15, at 298 (observing that the *Bandemer* "plurality lowered the intent barrier essentially by presuming intent") (footnote omitted); Alfange, *supra* note 15, at 248 (same).

The complaint includes numerous specific allegations of discriminatory intent. RPNC claims that repeated efforts by Republicans to change from statewide to districtwide elections, including proposals offered during consideration of Chapter 509, were rejected by the Democratic-controlled General Assembly, thus revealing NCSBE's intent to operate the election scheme to further discrimination against those affiliating with the Republican Party. In addition, RPNC contends that since the turn of the century only one candidate for superior court judge running on the Republican ticket has been elected and that this is a significant allegation of purposeful exclusion. Importantly, all concede that superior court judges rarely, if ever, perform judicial duties outside their respective districts and divisions, and that the majority of the voters in one part of the state vote for candidates for superior court judgeships from other parts of the state without knowing anything about the various candidates other than the candidates' party affiliation as indicated on the ballot. RPNC avers that these allegations support an inference of bad intent because they reveal NCSBE's resolve to operate an election scheme that isolates those affiliating with the Republican party regarding the election of superior court judges.

In reaching this conclusion, we reject NCSBE's contention that *Bandemer* does not bear on this issue. Pointing out that *Bandemer* addressed intent with regard to the treatment by a legislature of its own election scheme, *see Bandemer*, 478 U.S. at 128, 106 S.Ct. at 2808, NCSBE argues that because RPNC's allegations pertain to a legislatively mandated design for the elec-

---

reliance on the one-person, one-vote principle, courts could not arrive at a manageable standard to adjudicate vote dilution challenges to judicial elections. Because *Wells* foreclosed such reliance, the state's argument continued, judicial elections should be invulnerable to claims of vote dilution. *See id.*

The Court rejected this argument, emphasizing that *Chisom* did not present the question of the appropriate standard to be applied in litigation under § 2 and that, in any event, the "analysis of a proper statutory standard ... need not rely on the one-person, one-vote constitutional rule." *Id.* at ⸺ n. 32, 111 S.Ct. at 2368 n. 32. Thus, because the Court discussed *Wells* in the context of the standard to be applied to cases questioning the application of the one-person, one-vote rule to the election of judges, we think

it is clear that the Court made no statement that *Wells* forecloses claims of vote dilution in regard to the election of judges.

**22.** Although a majority of the *Bandemer* Court agreed that political gerrymandering claims are justiciable, the Court did not reach a consensus on the issue of what a plaintiff must allege, and ultimately prove, in order to prevail on a claim of vote dilution in the context of political gerrymandering. Because we believe that the plurality opinion provides the "narrowest grounds" for decision, we apply it here. *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977); *see also Republican Party of Va. v. Wilder*, 774 F.Supp. 400, 404 (W.D.Va. 1991) (three-judge panel) (applying *Bandemer* plurality opinion).

tion of judges, members of a separate branch of government, this controversy lacks the self-interest evident in *Bandemer*. We do not agree, however, that political considerations and party allegiance so easily separate themselves when a legislature devises a districting scheme for another branch of government. While the self-interest may differ because it extends beyond the legislature to a coordinate branch, the controlling political party may nonetheless act to further its interests throughout the various spheres of government. Consideration of politics is inevitable in design of election schemes because of the political consequences, and we consequently perceive no distinction for purposes of assessing allegations of intent under 12(b)(6) between legislative design of election schemes for the legislature and superior court judges.[23]

### C.

■ Having concluded that the complaint contains sufficient statements of intent, we turn to consideration of whether RPNC has alleged an actual discriminatory effect. The Equal Protection Clause is violated in the state political gerrymandering context "only where a history (actual or

projected) of disproportionate results appears in" combination with "strong indicia of lack of political power and the denial of fair representation." *Id.* at 139, 106 S.Ct. at 2814. Thus, in order to claim an effect sufficient to state a violation of the Equal Protection Clause, RPNC must allege that the North Carolina voting scheme produces disproportionate results in elections for superior court judges and consistently degrades the influence of Republican voters "on the political process as a whole." [24] *Id.* at 132, 106 S.Ct. at 2810. Clearly, its complaint alleges disproportionate results.[25] RPNC claims that throughout the twentieth century, it has been, and continues to be, virtually impossible for a qualified candidate for a superior court judgeship to prevail, if running as a Republican. Specifically, RPNC states that only one Republican superior court judge has been elected in the approximately 220 elections held to fill this office since 1968. Yet, registered Republicans comprise approximately 27 percent of the voting population in North Carolina. Moreover, RPNC claims that consistency of voter habits combined with the geographical distribution of party affiliation throughout the state renders it likely

---

**23.** NCSBE further contends that RPNC fails to satisfy the intent element because inclusion of Democrats as plaintiffs prevents RPNC from constituting an "identifiable political group." The plurality opinion in *Bandemer* provides no insight to ascertaining the confines of an acceptable group for purposes of bringing a claim of political gerrymandering. Nonetheless, we consider the inclusion of two Democrats as plaintiffs to be unobjectionable. The complaint states that these plaintiffs have and will continue to vote for Republican candidates for superior court judgeships, thus alleging a sufficient degree of cohesiveness between the Democratic and Republican plaintiffs in order to withstand a motion to dismiss. *See* Michael A. Hess, *Beyond Justiciability: Political Gerrymandering After Davis v. Bandemer*, 9 Campbell L.Rev. 207, 234 & n. 128 (1987) ("The most readily identifiable voting group is one based on political affiliation and voting patterns."); *cf. Thornburg v. Gingles*, 478 U.S. 30, 56, 106 S.Ct. 2752, 2769, 92 L.Ed.2d 25 (1986) (Under § 2 of the Voting Rights Act, that "group members usually vote for the same candidates is one way of proving political cohesiveness" for a claim of vote dilution.). Moreover, the Republican Party of North Carolina alone would be sufficient to

constitute an identifiable group. *Cf. Bandemer*, 478 U.S. 109, 106 S.Ct. 2797 (addressing political gerrymandering claim of registered members of one party).

**24.** We read the phrase "the political process as a whole," *Bandemer*, 478 U.S. at 132, 106 S.Ct. at 2810, to speak to the alleged unconstitutional effects of the challenged electoral scheme on the relevant political sphere. *See* Grofman, *Toward a Coherent Theory, supra*, at 50–51. *But see* Daniel H. Lowenstein, *Bandemer's Gap: Gerrymandering and Equal Protection, in Political Gerrymandering* 64, 82 (Bernard Grofman, ed. 1990). Thus, we confine our analysis to evaluation of the claimed effect of the method of electing superior court judges on the political process of election of superior court judges within North Carolina.

**25.** We also observe that RPNC's allegations of effect are sufficient to satisfy the liberal standard applied by the federal courts under Rule 12(b)(6). *See* Wright & Miller, *supra*, § 1356. Whether RPNC ultimately prevails, however, is a matter of proof, and not merely one of the adequacy of the pleadings. *See id.*

that this trend will continue into the foreseeable future.

■ An election scheme, however, is not constitutionally infirm merely because it makes the election of a candidate slated by a particular political group more difficult. *Id.* at 131, 106 S.Ct. at 2810. Allegations of disproportionate results alone are insufficient. *Id.* at 131–32, 106 S.Ct. at 2810. "Rather, unconstitutional discrimination occurs only when the electoral system is arranged in a manner that will consistently degrade a voter's or a group of voters' influence on the political process as a whole." *Id.* at 132, 106 S.Ct. at 2810.

■ RPNC's complaint sets forth data to support its allegations that not only are the election results disproportionate, but also that the nomination and slating of candidates is affected. Claiming that the method of electing superior court judges inhibits potential Republican candidates from seeking this office, RPNC points to data revealing that in the 1984 and 1986 general elections of 40 judgeships up for election, only four were contested by Republican candidates, and that since 1968, of approximately 220 judgeships up for election, a Republican candidate offered for election in only ten. RPNC maintains that these data demonstrate that few Republicans will offer to run since the chance of success is almost nonexistent. RPNC also asserts that the method of electing superior court judges diminishes campaign contributions for these elections because potential contributors are unwilling to donate money or other resources to a candidate who is perceived to be an almost certain loser. Thus, the complaint does contain allegations of an effect that goes beyond mere disproportionate election results.[26]

Importantly, Republican success in other elected positions in North Carolina affirms our conviction that RPNC has sufficiently alleged more than a de minimis effect on the political process of electing superior court judges. Data offered by RPNC and NCSBE reveal that Republicans prevail in statewide elections for positions that are truly statewide offices and in districtwide elections for positions in which the officials actually function in a local capacity. For example, district judges in North Carolina, like superior court judges, have statewide jurisdiction, *see* N.C.Gen.Stat. §§ 7A–240, 7A–270 (Michie 1989), but are elected by district, *see* N.C. Const. art. IV, § 10; N.C.Gen.Stat. § 7A–140 (Michie 1989). According to RPNC, between 1968 and 1986, nine districts have elected Republicans to this office. It is undisputed that Republican candidates have won the races for Governor in three of the last five elections, that four of the last six elections for United States Senator have resulted in Republican victories, and that currently four of eleven members of the United States House of Representatives from North Carolina are Republicans. In addition, numerous Republicans have been elected to the General Assembly, the North Carolina Court of Appeals, and the North Carolina Supreme Court. Republican strength in North Carolina is sufficient to elect officials when the election base mirrors the area served by the official, focuses the attention of the electorate, and allows the electorate to become informed about the candidates.

Contests for superior court judgeships, on the other hand, involve statewide elections even though the office is essentially a local one and with very few exceptions, candidates are known only within their local areas. This combination of factors—the status as a statewide candidate for a local office, the requirement to run in a statewide election, and the placement on a ballot with numerous other candidates seeking the same office but from different

---

**26.** NCSBE implores us to hold that RPNC's complaint fails to satisfy *Bandemer* because it lacks supporting allegations and amounts to little more than a compilation of conclusory statements. *See Badham v. March Fong Eu,* 694 F.Supp. 664, 670–71 (N.D.Cal.1988) (holding that complaint setting forth repetitive and conclusory claims failed to satisfy requirement of *Bandemer* that plaintiff allege exclusion from the political process as a whole), *aff'd mem.,* 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962 (1989). Our review discloses, however, that the allegations are sufficient in number, detail, and variety of particulars to avoid the problem of repetitive or conclusory statements.

local districts—encourages and as history has demonstrated, results in straight-party voting. Voters have little incentive to focus on individual candidates who reside in other districts and thus will discharge their duties in areas of the state distant from the voters' local area.

We recognize that RPNC has not alleged that Republicans have been "excluded from participating in the affairs of their own party or from the processes by which candidates are nominated and elected," *Bandemer*, 478 U.S. at 137, 106 S.Ct. at 2813, and that to the extent *Bandemer* might be read to require such allegations in order for a political group to allege exclusion from the political process as a whole, RPNC's claims would fail. However, we cannot conclude that a political party that has clearly alleged an effect that amounts to more than disproportionate election results must also allege and ultimately prove this type of exclusion. To do so would hold, in effect, that regardless of the specific allegations of its complaint an identifiable political group could not survive a motion to dismiss or prevail on the merits of its claim. We decline to adopt a construction of *Bandemer* that would render nugatory its holding that political groups may bring claims of partisan gerrymandering.

In determining whether a group has been shut out of the political process as a whole, the Supreme Court considers it relevant to examine the responsiveness of the elected official to the interests of the minority political group. *See id.* at 131, 106 S.Ct. at 2809–10. RPNC concedes that it has no complaint concerning the performance of superior court judges, that while elected judges are representative governmental officials, they do not represent constituents in the same sense as elected members of the legislative and executive branches, and that consequently, superior court judges could not be found to inadequately represent minority group interests. Nevertheless, the fact that superior court judges perform a different representative function does not mean an identifiable political group should have no protected rights in electing them once a state chooses to select

judges through an election system that allegedly fails to comport with the Fourteenth Amendment. We hold, therefore, that RPNC has set forth allegations of an actual discriminatory effect sufficient to state a claim of vote dilution brought about by political gerrymandering.

### D.

Our conclusion that RPNC has set forth sufficient allegations of a violation of the Fourteenth Amendment to survive a motion to dismiss for failure to state a claim, we emphasize, is narrow and wholly dependent on the egregious nature of the alleged systemic discrimination. *See* Alfange, *supra* note 15, at 179 (arguing that judicial intervention should be limited to cases displaying flagrant and obvious abuse to avoid "exposing virtually every districting plan to judicial scrutiny"). The confluence of the alleged facts, including the unique claim of a near century-long dearth of political diversity among superior court judges in North Carolina, and the certainty of a similar future, compels our holding. Indeed, we believe that if RPNC had alleged even a modicum of electoral success or access to the political process, its claim might not have withstood a challenge under Rule 12(b)(6). And, whether RPNC ultimately will prevail on its claim is not before us.

We remain mindful of Justice Frankfurter's admonition that courts should remain reticent to become ensnared in the "political thicket" of adjudicating gerrymandering claims, *Colegrove v. Green*, 328 U.S. 549, 556, 66 S.Ct. 1198, 1201, 90 L.Ed. 1432 (1946), and of the more recent concern expressed by Justice O'Connor in *Bandemer* that judicial consideration of claims of political gerrymandering will inevitably lead to a constitutional requirement of "some form of rough proportional representation for all political groups," *Bandemer*, 478 U.S. at 145, 106 S.Ct. at 2817 (O'Connor, J., concurring in judgment); *see also* Alfange, *supra* note 15, at 186–87 (discussing evils of proportional representation). We fully share these apprehensions. Nonetheless, we remain bound by the dictates of *Bandemer*.

*See United States v. Schooner Peggy,* 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801).

## V.

RPNC also maintains that the North Carolina method of electing superior court judges infringes upon its rights to free speech and association in violation of the First Amendment. Specifically, RPNC argues that the electoral system prevents Republicans from fully and effectively participating in the political process, chills the desire of Republicans to engage in vigorous debate and to seek superior court judgeships, and constitutes a state-imposed, de facto requirement of political affiliation with the Democratic Party.[27] Because the authority offered by RPNC is readily distinguishable and its reasoning is not compelling, we conclude that RPNC fails to state a claim under the First Amendment.[28]

## A.

■ "[T]here is practically universal agreement that a major purpose of [the First] Amendment [is] to protect the free discussion of governmental affairs. This of course includes discussions of candi-

dates, ... the manner in which government is operated or should be operated, and all such matters relating to political processes." *Mills v. Alabama,* 384 U.S. 214, 218–219, 86 S.Ct. 1434, 1436–37, 16 L.Ed.2d 484 (1966). In addition, it is clear that "[t]he First Amendment protects political association as well as political expression." *Buckley v. Valeo,* 424 U.S. 1, 15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) (per curiam). RPNC asserts that the First Amendment protects the rights of citizens to cast an effective vote regardless of political persuasion and to effectively associate for the advancement of political beliefs. Because the North Carolina election system prevents Republicans from electing the candidates of their choice for superior court judgeships, RPNC contends that these alleged rights have been violated.

RPNC confuses the protection offered by the First and Fourteenth Amendments, and in so doing, attempts to extend the guarantees of the First Amendment.[29] As noted previously, the Equal Protection Clause of the Fourteenth Amendment ensures equal weighing of votes, or to use RPNC's terms, equal effectiveness of votes. *See, e.g., Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). The First

27. In *Badham,* 694 F.Supp. at 675, the district court rejected a similar First Amendment claim based on political gerrymandering. At oral argument, NCSBE argued that the summary affirmance of *Badham,* 488 U.S. 1024, 109 S.Ct. 829, 102 L.Ed.2d 962, bound this court and required our rejection of this claim, *see Anderson,* 460 U.S. at 784 n. 5, 103 S.Ct. at 1568 n. 5 (precedential effect of summary affirmances applies to no more than the exact issue decided). However, the First Amendment issue raised before the district court was not presented to, and consequently was not decided by, the Supreme Court, *see Badham v. March Fong Eu,* 56 U.S.L.W. 3822 (U.S. May 31, 1988) (No. 87–1818). Therefore, we conduct an independent inquiry into the sufficiency of RPNC's First Amendment claims.

28. This court has held that in voting rights cases, no viable First Amendment claim exists in the absence of a Fourteenth Amendment claim. *See Irby v. Virginia State Bd. of Elections,* 889 F.2d 1352, 1359 (4th Cir.1989) (First Amendment offers no protection of voting rights *beyond* that afforded by the Fourteenth and Fifteenth Amendments.), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2589, 110 L.Ed.2d 270 (1990); *Washington v. Finlay,* 664 F.2d 913, 927 (4th

Cir.1981) (same), *cert. denied,* 457 U.S. 1120, 102 S.Ct. 2933, 73 L.Ed.2d 1333 (1982). Since RPNC has stated a Fourteenth Amendment claim, we must address the First Amendment issues.

29. We recognize that there is scholarly support for the extension of the ballot access reasoning to political vote dilution claims. *See, e.g.,* Hess, *supra* note 23, at 231–32 ("A first amendment analysis provides an effective means of balancing the constitutional interests of political parties ... in light of the legitimate interests of the state."); Emily M. Calhoun, *The First Amendment And Distributional Voting Rights Controversies,* 52 Tenn.L.Rev. 549, 588–598 (1985) (if state uses opinion as basis for distribution of votes, state must show compelling state interest); Harris Weinstein, *Partisan Gerrymandering: The Next Hurdle in the Political Thicket?,* 1 J.L. & Pol. 357, 373 (1984) (Political gerrymanders "strike at the heart of the rights of free speech and free association" because they "are designed to limit the effectiveness of organized political activity."). We find these arguments unpersuasive, and therefore decline to apply them here.

Amendment, in contrast, protects the right to cast an effective vote by prohibiting restrictions on ballot access that impair the ability of citizens to express their political preferences, or that limit the opportunity for citizens to unite in support of the candidate of their choice. *See Anderson v. Celebrezze,* 460 U.S. 780, 787–88, 794, 103 S.Ct. 1564, 1569–70, 1572–73, 75 L.Ed.2d 547 (1983); *Illinois State Bd. of Elections v. Socialist Workers Party,* 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). The North Carolina method of election for superior court judges does not entail direct impediments prohibited by the First Amendment. Unlike the complainants in the ballot access cases, Republicans in North Carolina may run for superior court judgeships, vote for the candidate of their choice, and associate together in support of their chosen candidate. Although the North Carolina method of election of superior court judges does prevent the realization of Republican political goals, Republicans are not prevented from participating, as individuals or as a group, in the election of superior court judges. The First Amendment guarantees the right to participate in the political process. It does not guarantee political success.

### B.

 RPNC also asserts that the system of electing superior court judges chills the rights of Republicans to engage in vigorous debate, and to seek superior court judgeships in violation of the First Amendment. A chilling effect occurs when a substantially overly-broad law deters persons whose expression is constitutionally protected from exercising their First Amendment rights. *See New York v. Ferber,* 458 U.S. 747, 768–73, 102 S.Ct. 3348, 3360–63, 73 L.Ed.2d 1113 (1982). Absent a governmental action that threatens to punish protected speech, the substantial overbreadth doctrine does not apply, and a chilling effect does not occur. *See Broadrick v. Oklahoma,* 413 U.S. 601, 611–618, 93 S.Ct.

2908, 2915–19, 37 L.Ed.2d 830 (1973). The North Carolina laws at issue do not subject Republicans to the threat of civil or criminal penalties for engaging in political expression. *See* N.C. Const. art. IV, § 16; N.C.Gen.Stat. §§ 163–104, 163–106(i) (Michie 1991). Election practices that do not threaten to penalize protected speech, but that may have some effect on the decision whether to seek candidacy or engage in debate, are not overly broad. Thus, RPNC's overbreadth claim does not give rise to a constitutional infringement.

### C.

 Finally, RPNC argues that because the government may not unjustifiably require an individual to choose between accepting public employment and taking action contrary to their chosen political affiliation, *see, e.g., Elrod v. Burns,* 427 U.S. 347, 359–60, 96 S.Ct. 2673, 2683, 49 L.Ed.2d 547 (1976), the Democratic-controlled legislature may not similarly require individuals to choose between political office and affiliation with the Republican Party. That the hiring of low-level public employees may not be predicated upon political party affiliation is clear, *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 64–65, 110 S.Ct. 2729, 2732, 111 L.Ed.2d 52 (1990);[30] however, North Carolina superior court judges are elected public officials rather than employees hired by the government. This distinction between the government as hiring authority versus the electorate as hiring authority is crucial. An employee's right to free speech is violated only when government inappropriately requires an employee to affiliate with a certain party. *Id.* at 73–79, 110 S.Ct. at 2736–39. On the other hand, the electorate does not operate under this constraint. *Cf. Hudgens v. NLRB,* 424 U.S. 507, 513, 96 S.Ct. 1029, 1033, 47 L.Ed.2d 196 (1976) ("[T]he constitutional guarantee of free speech is a guarantee only against abridgement by government, federal or state."). Seeking to avoid the result that follows

---

**30.** Political party affiliation may be an appropriate consideration if the position is one that requires as a qualification for its performance, affiliation with a particular political party. *Rutan,* 497 U.S. at 64–65, 110 S.Ct. at 2732.

from this proposition, RPNC argues that by prescribing the current method of election the legislature, a governmental body, has usurped the electorate's selection function. We are not persuaded. The North Carolina electorate, not the General Assembly, selects superior court judges. Therefore, RPNC has failed to state a claim for the infringement of its rights to free speech and association in violation of the First Amendment.

## VI.

In sum, we hold that RPNC's claim of political gerrymandering in the election of North Carolina superior court judges presents a justiciable question and that its complaint states a claim upon which relief may be granted under the Fourteenth Amendment. We further hold that RPNC has failed to state a claim under the First Amendment. Thus, we reverse in part, affirm in part, and remand for further proceedings consistent with this opinion.

REVERSED IN PART; AFFIRMED IN PART; AND REMANDED.